NEILL W. PORTERMAIN AND FLORENCE M. PORTERMAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Portermain v. Commissioner
Docket No. 23759-84
United States Tax Court
T.C. Memo 1989-539; 1989 Tax Ct. Memo LEXIS 539; 58 T.C.M. (CCH) 293; T.C.M. (RIA) 89539; September 28, 1989
C. F. Allison, Jr. and William B. Steele III, for the petitioners. John S. Repsis and James F. Prothro, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency in petitioners, Federal income tax for the calendar year 1980 of $ 263,556, and an addition to tax under section 6653(a) [1] of $ 13,178. Petitioners concede receipt of constructive dividend income of $ 15,306 in 1980 from Mr. Portermain's wholly-owned corporation, *541 United Nebraska Investors, Inc. Petitioners paid the income tax attributable to this constructive dividend income before the notice of deficiency was issued. However, the deficiency attributable to the constructive dividend income was included in the notice. Accordingly, a Rule 155 computation will be necessary in the event we hold for respondent on all issues before us. After petitioners' concession, the remaining issues for decision are: (1) Whether installment sale gain recognized by petitioners in 1980 on the purported sale of their stock in South Rock, Ltd. in 1979 is long-term capital gain or ordinary income; and (2) whether petitioners are liable for the 5 percent addition to tax under section 6653(a) on the underpayment attributable to both the constructive dividend income and the installment sale gain. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioner Neill W. Portermain (Mr. Portermain) and petitioner Florence M. Portermain (Mrs. Portermain) filed a joint Federal income tax return for the calendar year 1980 with the District Director *542 of Internal Revenue in Austin, Texas. Petitioners reported their income under the cash receipts and disbursements method of accounting. At the time the petition in this case was filed, petitioners resided in McKinney, Texas. Mr. Portermain is an actuary by training and has worked in the insurance business since 1959. In the process, he developed extensive knowledge of the insurance industry in both domestic and foreign markets, including Bermuda. Petitioners' Holdings
On March 21, 1978, petitioners purchased 90 percent (10,800 shares) of the stock of Haplochromis, Ltd. (Haplochromis), a Bermuda corporation, for $ 2,160. Mrs. Portermain owned a single share and Mr. Portermain owned the rest. The remaining 10 percent of the stock was purchased by J. Douglas Robinson, a resident of Bermuda. At the time of the purchase, Haplochromis was a dormant company, but later became authorized to do business in Bermuda as an insurance brokerage firm. In April 1978, Haplochromis' name was changed to South Rock, Ltd. (South Rock). As of July 1, 1979, Mr. Portermain was the sole shareholder of United Nebraska Investors, Inc. (United Nebraska), a Nebraska corporation. United Nebraska *543 had its corporate headquarters in Richardson, Texas, and served as an insurance holding company for two wholly-owned subsidiaries. The two subsidiaries were International Underwriters, Inc., a Nebraska corporation (International-Nebraska), and Bercanus Insurance Company, Ltd. (Bercanus), a Bermuda corporation. International-Nebraska had its corporate headquarters in Richardson, Texas, and provided accounting, claims processing, reinsurance brokering, and other services to several entities owned or controlled by Mr. Portermain. Bercanus' corporate headquarters was in Bermuda. Beacon Insurance Company (Beacon), a North Carolina corporation, was a wholly-owned subsidiary of Bercanus. Both Bercanus and Beacon provided direct insurance, and reinsurance in the property, casualty and malpractice insurance areas. Bercanus acquired Beacon in 1978 in order to obtain an existing insurance company authorized to write certain types of insurance in States within the United States for which Bercanus itself had been unauthorized. Mr. Portermain owned 65 percent of International Underwriters Agency, Inc., a Texas corporation (International-Texas). International-Texas had its corporate headquarters *544 in Richardson, Texas, and performed services similar to those provided by International-Nebraska. However, unlike International-Nebraska, International-Texas had the authority to represent Bercanus as a managing general agency in Texas. Mr. Portermain owned 40 percent of B.F.G. Toomey Associates, Ltd., located in London, England (Toomey-London). Toomey-London acted as a broker for Bercanus and Beacon in the London insurance and reinsurance market. Mr. Portermain also owned 25 percent of Toomey Associates, Ltd., a Bermuda corporation. South Rock's Management Agreement With Bercanus
On June 1, 1978, Brian Stephenson (Mr. Stephenson) became employed by South Rock as manager-controller. Mr. Stephenson was a British citizen and resident of Bermuda. He was a chartered accountant (the equivalent of a certified public accountant in the United States) and had worked at various accounting firms from 1960 or 1961 through 1973. Mr. Stephenson also holds the professional designation of Associate of the Chartered Insurance Institute (ACII), which is a certification for underwriters in the United Kingdom. In 1973, Mr. Stephenson had become employed as an account executive with International *545 Risk Management, Ltd., which specialized in the management of captive insurance companies. On October 1, 1979, Mr. Stephenson (on behalf of South Rock) entered into a "Management Agreement" with Mr. Portermain (on behalf of Bercanus), to be retroactively effective as of May 1, 1979. The term of the agreement was the two-year period from and including May 1, 1979 through May 1, 1981. After this two-year period, the agreement could be terminated by either party giving at least thirty days' written notice to the other. Until termination of the Management Agreement, Bercanus agreed and covenanted to pay South Rock: (1) an annual fee equal to five percent of the gross written premiums plus commissions received, provided that such fee and commissions paid may not exceed $ 1 million in any year; (2) any additional fees as have been mutually agreed upon; and (3) any necessary funds to pay Bercanus-approved legal claims and underwriting and general operating expenses. In the insurance business, a managing agent's fees are usually a fixed annual amount or are based upon a percentage of premium volume. However, the $ 1 million "cap" on South Rock's annual fee from Bercanus under the Management *546 Agreement was an unusual term for such an agreement in the insurance business. The Management Agreement authorized South Rock to act as Bercanus' managing agent for insurance and reinsurance which Bercanus was authorized to write. South Rock's duties as managing agent were subject to the supervisory approval of the Board of Directors of Bercanus. However, the agreement stated generally that South Rock "shall control the general management of the bu[siness] of the Company [i.e., Bercanus] and enter into any trade contracts on behalf of the Company in the ordinary way of business and do all other acts and things which it may consider necessary or conducive to the interests of the Company." South Rock's specific duties under the Management Agreement included the authority to: (1) underwrite insurance and reinsurance on behalf of Bercanus; (2) sign and issue insurance and reinsurance policies in Bercanus' name; (3) process claims for losses; (4) reinsure risks; (5) keep books of account and prepare specified financial statements; (6) invest available funds; and (7) open a general business bank account at the Bank of Bermuda and act as a trustee for Bercanus with respect to deposited *547 funds. Mr. Stephenson was South Rock's only employee. He had no insurance sales experience or training and did little in the way of business development for South Rock. Mr. Portermain was (before and after the "sale") the driving force in business development. Mr. Stephenson performed no underwriting services for Bercanus, but he did maintain books and records to account for South Rock's own business. Bercanus' books and financial statements were maintained and prepared, respectively, by employees of either International-Nebraska or International-Texas, and audited by an independent accounting firm. Mr. Stephenson prepared so-called "statutory financial statements" for submission to the Bermuda government based upon Bercanus' audited financial statements. Given the rather minimal level of services actually performed by South Rock for Bercanus, we find the amount of management fees paid to be excessive. The following is an analysis of total brokerage commissions and management fees received by South Rock from Bercanus and other (presumably unrelated) companies for the calendar years 1978 through 1983: Brokerage Commissions and Management Fees
Year
Bercanus
Other Companies
Total
1978
$ 451,472
$ 451,472
1979
666,666
$ 297,122
963,788
1980
1,000,000
184,600
1,184,600
1981
1,000,000
81,937
1,081,937
1982
999,563
999,563
1983
118,688
118,688
*548 For the same period, the following is a summary of South Rock's financial accounting income, expenses and retained earnings for the calendar years 1978 through 1983: 1978 *
1979
1980
1981
1982
1983
Income:
Brokerage
$ 451,472
$ 622,765
$ 572,872
$ 369,356
$ 561,416
$ 748
Management fees
341,023
611,728
712,581
438,147
117,940
Interest
30,081
65,425
63,978
48,260
33,443
8,552
481,553
1,029,213
1,248,578
1,130,197
1,033,006
127,240
Expenses
34,798
354,591
251,097
153,703
75,287
82,986
Net Income
446,755
674,622
997,481
976,494
957,719
44,254
Retained Earnings:
Beginning balance
446,755
671,377
362,961
339,445
297,174
1,121,377
1,668,858
1,339,445
1,297,174
341,428
Dividends
450,000
1,305,897
1,000,000
1,000,000
250,000
Ending balance
$ 446,755
$ 671,377
$ 362,961
$ 339,445
$ 297,174
$ 91,428
Finally, the following is a summary of South Rock's total assets, liabilities and shareholders' equity for financial accounting purposes as of December 31 of the same years: 1978
1979
1980
1981
1982
1983
Assets
$ 598,458
$ 834,825
$ 581,370
$ 615,961
$ 1,601,749
$ 100,516 Liabilities
149,303
161,048
216,009
274,106
1,302,175
6,688
Shareholders'
equity
$ 449,155
$ 673,777
$ 365,361
$ 341,855
$ 299,574
$ 93,828
*549 Disposition Of South Rock Stock
In early 1979, petitioners decided to dispose of their 90 percent stock ownership interest in South Rock. In March or April of 1979, Mr. Portermain contacted his certified public accounting firm and asked them to formulate a plan for the disposition of his South Rock stock on a "tax efficient" basis. The accounting firm, in turn, introduced him to a law firm in Dallas, Texas. Mr. Portermain looked to the accounting and law firms for their advice on how to structure the sale of his South Rock stock so as to receive capital gain treatment. A junior attorney at the law firm prepared a memorandum dated May 2, 1979, titled "Tax Issues in connection with Redemption of stock held by Neill Portermain." The memorandum was directed to two other senior attorneys at the firm. In conclusion, the memorandum stated that the risk was "not insignificant" that a redemption by Mr. Portermain of his South Rock stock would not result in capital gains treatment. The junior attorney prepared another memorandum dated May 17, 1979, titled "United States income tax considerations of a sale of stock held by Neill W. Portermain." This memorandum was also directed *550 to the two senior attorneys. The memorandum considered the income tax consequences of a sale by Mr. Portermain of his South Rock stock to Mr. Stephenson, South Rock's only employee. In conclusion, the memorandum stated: On balance, the contemplated sale of the stock to Stephenson entails a lesser risk that the expected United States income tax consequences will indeed be realized by Portermain than the previously contemplated redemption of such stock. Nevertheless, due to the relatively high purchase price, Portermain's control over Southrock's future earnings and the fact that such earnings are likely to be the only source of funds for payment of the purchase price, the risk that the sale will be characterized as a "sham" and a device designed to allow Portermain to retrieve future earnings of Southrock at capital gains rates, where Stephenson is used as a mere conduit, may not be characterized as insignificant. Mr. Portermain did not actually receive copies of the May 2 and May 17 memoranda. However, the substance of the advice was either communicated directly to him or was passed on to him through his advisors, who include his accounting firm and his in-house legal counsel. *551 Thus, although Mr. Portermain may not have been aware of the technical intricacies of the tax law pertaining to the transaction, at a minimum he was aware of the "bottom-line" opinion of his counsel as to the tax implications of a "sale" to Mr. Stephenson. In May or June of 1979, Mr. Portermain first approached Mr. Stephenson about the sale of his South Rock stock. Mr. Stephenson testified (by deposition offered by the parties as if it were trial testimony) regarding discussions with Mr. Portermain as follows: MR. STEELE: When you were discussing the sale, did you and Mr. Portermain discuss potential earnings for the company [i.e., South Rock]? MR. STEPHENSON: Yes. MR. STEELE: What did those discussions involve? What potential earnings did you discuss? MR. STEPHENSON: It was anticipated South Rock would be earning one million dollars, approximately, annually. MR. STEELE: Now, at the time when he discussed the potential sale of the stock to you, did Mr. Portermain explain that there would be tax advantages to him in this particular sale? MR. STEPHENSON: Yes, I understand there would be tax advantages for him. MR. STEELE: How did the parties agree upon a sale price *552 for the South Rock stock? I believe you have mentioned expected earnings of one million a year. MR. STEPHENSON: Neill Portermain mentioned a sale price or purchase price. MR. STEELE: What was that? Do you recall? MR. STEPHENSON: Well, we were talking about a purchase over a period of ten years with anticipated earnings of approximately one million per year. * * * Mr. Portermain first proposed a selling price for his South Rock stock of $ 8.5 million. This price was based upon a factor of ten times South Rock's projected earnings of $ 1 million times Mr. Portermain's ownership interest of 90 percent (i.e., $ 9 million), reduced to $ 8.5 million as an incentive to Mr. Stephenson. In Mr. Portermain's words, the incentive was to provide "leeway if in fact he [i.e., Mr. Stephenson] continued to produce premiums that would give him the amount of money payable under the Bercanus management agreement." No independent appraisal of the stock was performed. After Messrs. Portermain and Stephenson reached an agreement in principle regarding the proposed transaction, the Dallas law firm was asked to prepare necessary documents. Mr. Portermain's in-house legal counsel, Katherine *553 D. Woodruff (Ms. Woodruff), was asked to prepare the Management Agreement between South Rock and Bercanus, discussed above. The draft documents went through a revision process. At one point, Mr. Stephenson suggested that the following provision be added to the South Rock stock purchase agreement: 2.4 Future Income. Seller acknowledges that the major part of South Rock's earnings are and will in the future be derived from brokerage income and management fees accruing to South Rock through the application since inception of South Rock of Seller's knowledge and expertise. Seller also acknowledges that Buyer has agreed to the purchase price of the said shares in South Rock on the Seller's assurances that income from these sources will not be less than $ 1,000,000.00 (One Million Dollars) per annum for each of the ten years subsequent to the date of this Stock Purchase Agreement. Accordingly, Seller warrants that in order to compensate for any short fall of annual income below $ 1,000,000.00 (One Million Dollars) such short fall may be deducted from the quarterly installments due under the promissory note referred to in 1.5 (b) hereof and the relevant amounts of interest and *554 principal will be deemed to have been paid in full. In a memorandum dated August 14, 1979, one of the senior attorneys at the Dallas law firm advised Mr. Portermain as follows: Management Agreement. Stephenson desired to tie the stock purchase agreement and the management contract together. I advise against tying the two documents together and suggest that you and Stephenson work out a separate arrangement. * * * The provision regarding future income suggested by Mr. Stephenson was not included in the executed closing documents. On October 2, 1979, the closing of the transaction took place in Bermuda. Ms. Woodruff acted on behalf of petitioners pursuant to a power of attorney. A number of documents were signed at the closing, all to be retroactively effective as of July 1, 1979. The Stock Purchase Agreement stated a total purchase price for petitioners' South Rock stock of $ 6,803,475.17. The purchase price was payable at closing by the delivery of a cashier's check in the amount of $ 446,358.06 and a promissory note in the principal amount of $ 6,357,117.11. The amount of the cashier's check equalled South Rock's reported earnings and profits as of July 1, 1979. *555 The promissory note stated an interest rate of 6 percent per annum, and was payable in 40 consecutive quarterly installments of $ 212,500.00, totalling $ 8.5 million. Mr. Stephenson was the maker of the promissory note, which was nonrecourse. As security, Mr. Stephenson pledged all South Rock stock acquired and granted petitioners a security interest in all dividends, payments and distributions made with respect to such stock. Also on October 2, 1979, Mr. Stephenson and Ms. Woodruff (on behalf of petitioners) signed an "Agreement and Certification" to amend the Stock Purchase Agreement. Mr. Stephenson certified that he caused to be paid to Mr. Portermain from July 1, 1979, to October 1, 1979, the amount of $ 180,000.00 "as a tender offer to be applied to reduce the amount of the down payment stated in the stock purchase agreement * * *." In actuality, the $ 180,000.00 represented amounts withdrawn by Mr. Portermain as dividends from South Rock during the period July 1, 1979, through October 1, 1979. Mr. Stephenson received a $ 250,000.00 distribution from South Rock on October 2, 1979. The Stock Purchase Agreement was amended to provide that the remaining balance of the down *556 payment of $ 266,358.06 was to be paid without interest on or before October 1, 1980. The Agreement and Certification was later amended by Messrs. Portermain and Stephenson to provide that 6 percent simple interest would accrue on the unpaid balance. Finally, Mr. Stephenson certified that he tendered the first installment payment of $ 212,500.00 due under the promissory note to Mr. Portermain's agent at Bercanus' office. The South Rock shares of stock were endorsed and transferred by petitioners to Mr. Stephenson, bearing a transfer date of October 2, 1979. A Bermuda stamp tax of $ 34,017.38 was paid on the transfer of the shares. Petitioners resigned as officers and directors of South Rock, effective July 1, 1979. Events Subsequent To Closing
On September 9, 1980, Mr. Stephenson paid off the remaining balance of the down payment of $ 266,358.06 specified in the amended Stock Purchase Agreement, plus accrued interest of $ 9,943.43. Mr. Stephenson also paid required installments due on the promissory note through January 4, 1983, totalling $ 2,975,000.00. Mr. Stephenson took distributions from South Rock to make required payments to petitioners as follows: Payments by Mr. Stephensen
South Rock Dividends
to Petitioners
Date
Amount
Date
Amount
07/11/79
$ 100,000.00
07/24/79 $  90,000.00
08/24/79
100,000.00
09/04/79 90,000.00
10/01/79
250,000.00
10/01/79 212,500.00
Total 1979
$ 450,000.00
Total 1979
$ 392,500.00
01/02/80
$ 250,000.00
01/03/80 $ 212,500.00
02/19/80
110,000.00
02/19/80 99,000.00
04/02/80
250,000.00
04/01/80 212,500.00
04/28/80
55,953.40
04/28/80 50,358.06
06/25/80
60,000.00
06/25/80 54,000.00
07/01/80
250,000.00
07/01/80 212,500.00
09/09/80
79,943.43
09/09/80 72,943.43
10/01/80
250,000.00
10/01/80 212,500.00
Total 1980
$ 1,305,896.83
Total 1980
$ 1,126,301.49
01/02/81
$ 250,000.00
01/05/81 $ 212,500.00
04/01/81
250,000.00
04/01/81 212,500.00
07/01/81
250,000.00
07/02/81 212,500.00
10/01/81
250,000.00
10/01/81 212,500.00
Total 1981
$ 1,000,000.00
Total 1981
$ 850,000.00
01/02/82
$ 250,000.00
01/04/82 $ 212,500.00
04/01/82
250,000.00
04/01/82 212,500.00
07/01/82
250,000.00
07/07/82 212,500.00
10/01/82
250,000.00
10/08/82 212,500.00
Total 1982
$ 1,000,000.00
Total 1982
$ 850,000.00
01/04/83
$ 250,000.00
01/04/83 $ 212,500.00
Total 1983 $ 250,000.00
Total 1983
$ 212,500.00
*557 Beginning in 1981 and continuing into 1982 and 1983, the insurance market in Bermuda began to soften. United States insurance companies began to lower their rates to respond to competition, and offshore "unrated" insurance companies (such as Bercanus) began to suffer. Further, insurance companies in Bermuda, in general, had historically underpriced risks and began to incur dramatic losses. As a consequence of Bercanus' drop in business, South Rock's earnings under the Management Agreement also began to decline. On April 27, 1983, the Stock Purchase Agreement and related documents were amended to provide for a reduction in the purchase price of the South Rock stock to the amount which had been paid by Mr. Stephenson as of such date. The remaining unpaid balance on the promissory note was forgiven. Further, the Management Agreement was amended to provide that the annual fee paid by Bercanus to South Rock would be fixed at $ 90,000.00 per year. South Rock continued to serve Bercanus under the Management Agreement, as amended, until it resigned on September 30, 1984. At the end of 1984, South Rock became a dormant company and Mr. Stephenson referred remaining customers to another *558 managing agency in Bermuda, Meadowbrook Risk Management, Ltd., where he became an employee. Petitioners' Returns
Petitioners reported gain on the sale of their South Rock stock on the installment method under section 453. On their 1979 return, petitioners reported gain realized on the sale of the stock of $ 6,801,315, computed by subtracting their basis in the stock of $ 2,160 from the sales price of $ 6,803,475. Petitioners reported collections on the installment sale in 1979 of $ 297,143, resulting in gain recognized in such year of $ 297,048. The return showed earnings and profits of South Rock as of June 30, 1979, of $ 495,953, of which $ 446,358 was petitioners' pro rata share (i.e., 90 percent times $ 495,953). Accordingly, under section 1248(a), the full amount of gain recognized in 1979 was reported as a dividend. On their 1980 return, petitioners reported collections on the installment sale of $ 752,768, resulting in gain recognized of $ 752,529. Under section 1248(a), $ 149,310 of the gain recognized in 1980 was reported as a dividend (i.e., $ 446,358 minus $ 297,048). The balance of the gain recognized in 1980 of $ 603,219 was reported as long-term capital *559 gain. OPINION Preliminary Matter
After respondent's opening statement at trial, petitioners' objected to what they considered to be a new theory advanced by respondent. We reserved making a final ruling at trial on petitioners' objection and consider it now. Respondent phrased the disputed theory as follows: "The transaction was nothing more than a device by which Bercanus' distribution of dividends to petitioner [sic] was thinly disguised as a capital transaction. * * *" Petitioners objected because, in their view, respondent had not previously raised the issue of whether petitioners received a constructive dividend from Bercanus. Rather, petitioners argue that the only issue that had been raised was whether the sale of the South Rock stock was valid and the characterization of the gain on sale. Respondent's notice of deficiency to petitioners contained the following explanation for the determined deficiency in issue: We disallowed your long term capital gain for $ 603,219.00 since you have not substantiated that a sale occurred and if a sale did occur that it qualified for long term capital gain treatment. Furthermore, you have not substantiated the claimed *560 selling price is the real fair market value and that the purported sale was an arms length transaction. * * * Thus, the two bases for respondent's determination were that a sale did not occur, but alternatively if a sale did occur then the gain was not entitled to long-term capital gain treatment. The issue of whether petitioners received a constructive dividend from Bercanus was not mentioned. The petition averred error on the part of respondent in denying long-term capital gain treatment, which was denied in respondent's answer. Rule 41(b)(2) [2] encourages this Court to accept evidence that is not within the issues raised by the pleadings "freely when justice so requires" provided the objecting party is not prejudiced by its admission. , affd. . *561 We think that respondent's determination that no sale occurred gave petitioners adequate notice before trial that respondent might argue that petitioners received dividend income from South Rock. To avoid any possible prejudice to petitioners, however, we will not consider respondent's argument raised at trial that petitioners received constructive dividend income from Bercanus. Finally, the amount of the deficiency in this case was determined by treating all of the installment sale gain in 1980 as ordinary income. Determining that petitioners' installment sale gain was ordinary income results in a lower deficiency than if it were determined that petitioners received dividend income, due to the recovery of basis under an installment sale. Accordingly, based upon respondent's determination, in the event we hold that the sale was a sham and petitioners received dividend income, the amount of deficiency which may be assessed is limited to that set forth in the notice of deficiency. See sec. 6214(a). Long-Term Capital Gain Or Ordinary Income
Respondent argues that petitioners' purported sale of their South Rock stock was a sham transaction because it was conceived, *562 structured, and carried out solely for the purpose of tax avoidance. Petitioners argue that they sold their South Rock stock to Mr. Stephenson in an arm's-length transaction and for a reasonable price, such that the transaction was a sale for Federal income tax purposes and qualifies for long-term capital gain treatment. Petitioners have the burden of proving that respondent's determination is incorrect. ; Rule 142(a). A "long-term capital gain" (as defined for 1980) is a gain from the sale or exchange of a capital asset held for more than one year. Sec. 1222(3). Prior to the Tax Reform Act of 1986, Pub. L. 99-514, sec. 301, 100 Stat. 2085, 2216-2219, noncorporate taxpayers were allowed to deduct from gross income 60 percent of any long-term capital gain in a taxable year. See sec. 1202. In comparison, dividends are taxed in full as ordinary gross income. See sec. 61(a)(7). The issue in dispute which we must decide is whether petitioners in fact sold their South Rock stock to Mr. Stephenson for Federal income tax purposes. It is well settled that the economic substance of a transaction and not its form is controlling *563 for Federal income tax purposes. . Transactions which are entered solely for the purpose of obtaining tax benefits and which are without economic substance are considered shams for Federal income tax purposes. ; . We have defined "sham in substance" as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." , citing . In the context of a sale transaction, as here, our task is to determine whether the parties have in fact done what the form of their arrangement purports to do. . The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. . *564 The key to deciding whether a particular transaction is a sale is to determine whether the benefits and burdens of ownership have passed to the putative purchaser. . This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. , affd. . Respondent frames his argument by analyzing factors which have been considered by the courts in deciding whether a sale occurred, as outlined in In Falsetti, we repeated eight factors first enumerated in Grodt & McKay Realty, Inc.: (1) Whether legal title passed; (2) whether the parties treated the transaction as a sale; (3) whether the alleged purchaser acquired an equity in the property; (4) whether the contract of sale creates a present obligation on the seller to execute and deliver a deed and present obligation on the purchaser to make payments; (5) whether the purchaser *565 is vested with the right of possession; (6) whether the purchaser pays property taxes following the transaction; (7) whether the purchaser bears the risk of loss or damage to the property; and (8) whether the purchaser receives the profits from the operation and sale of the property. . A ninth factor discussed in Falsetti is "the presence or absence of arm's-length dealing." . Since a normal attribute of a true arm's-length sale is a purchase price at least approximately equal to fair market value, the presence of a totally disproportionate purchase price strongly militates against a taxpayer's contention that a true sale has taken place. , citing , affg. on different grounds . Both Falsetti and Grodt & McKay Realty, Inc. involved the issue of whether there was a sale of real property, not stock as in the present case. Thus, these factors are either less relevant in this case or must be *566 considered in a different light. See . Respondent's argument on brief essentially modifies the above listed factors so as to apply within the context of a sale of stock. [3] Petitioners submit that the relevant factors we should consider were expressed by the Supreme Court in , involving a challenged sale of stock. However, petitioners also argue that even if this case is analyzed under the factors argued by respondent, it is clear that the sale was not a sham and should be respected for tax purposes. In deciding this case, we will consider the factors argued by respondent to the extent they are applicable in the sale of stock context, as well as those discussed in Brown. *567 In Brown, the taxpayers sold their stock in a lumber company, which had substantially appreciated in value, to a tax-exempt charitable organization. It was provided that simultaneously with the transfer of the stock, the charitable organization would liquidate the company and lease its assets for five years to a new corporation. The new corporation was formed and wholly-owned by the taxpayers' attorneys. The new corporation would pay 80 percent of its operating profit (without allowance for depreciation or taxes) to the charitable organization, and 90 percent of such payments would be paid over to the taxpayers to apply to a noninterest-bearing note. . At the trial level in this Court, the Commissioner asserted that the transaction was a sham and that in any event the taxpayers retained such an economic interest in and control over the property sold that the transaction could not be treated as long-term capital gain. We rejected the Commissioner's argument and held that a sale occurred and that the taxpayers were entitled to long-term capital gain treatment, , affd. , *568 affd. . The Supreme Court repeated with approval our findings in Brown that: [1] there had been considerable good-faith bargaining at arm's-length between the Brown family [i.e., the taxpayers] and the Institute [i.e., the purchaser], [2] that the price agreed upon was within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of its assets, [3] that the primary motivation for the Institute was the prospect of ending up with the assets of the business free and clear after the purchase price had been fully paid * * * and [4] that there had been a real change of economic benefit in the transaction. * * * [.] In response to the Commissioner's argument that there was no sale because the entire risk of the transaction remained on the sellers, the Supreme Court stated: To say that there is no sale because there is no risk-shifting and that there is no risk-shifting because the price to be paid is payable only from the income produced by the business sold, is very little different from saying that because business earnings are *569 usually taxable as ordinary income, they are subject to the same tax when paid over as the purchase price of property. This argument has rationality but it places an unwarranted construction on the term "sale," is contrary to the policy of the capital gains provisions of the Internal Revenue Code, and has no support in the cases. We reject it. * * * [.] We have considered the various factors and arguments made by both parties within the context of the rather unique facts and circumstances presented in this case. Having done so, we are convinced that the Management Agreement was simply a device to funnel earnings from Bercanus to South Rock, and that the "sale" of South Rock's stock was an attempt by petitioners to convert ordinary income received by South Rock under the Management Agreement into long-term capital gain. Accordingly, we hold that the purported sale of South Rock stock by petitioners was a "sham in substance" (see ), and petitioners are thus not entitled to long-term capital gain treatment. Before the purported sale, petitioners directly owned 90 percent *570 of South Rock's stock and Mr. Portermain owned all of the stock in Bercanus' parent company. Under petitioners' control, South Rock agreed on October 1, 1979, to act as a managing agent for Bercanus in consideration for a fee equal to 5 percent of premiums on policies written, not to exceed $ 1 million per year. The amount of this fee was excessive, given the minimal services actually performed by South Rock. Indeed, many of South Rock's duties under the agreement (e.g., underwriting and sales) were in actuality performed by Mr. Portermain and by employees of his other corporations. Also, the $ 1 million "cap" on South Rock's annual fee served no legitimate business purpose, but rather simply provided a predictable cash-flow to South Rock on which petitioners could determine the selling price of their South Rock stock. The lack of arm's-length dealing, the excessive fee, the performance of South Rock's contractual duties by persons other than South Rock's employee, and the arbitrary cap on the annual amount of the fee, all support our conclusion that the Management Agreement was a device to funnel earnings from Bercanus to South Rock. The day after the Management Agreement was *571 entered into, petitioners agreed to "sell" their South Rock stock to Mr. Stephenson, a resident of Bermuda and South Rock's only employee. The Management Agreement and the sale documents bore retroactive effective dates of May 1 and July 1, 1979, respectively. By using retroactive dates, petitioners put the Management Agreement in force two months before the alleged sale to create an earnings history on which to base their valuation of their South Rock stock. The $ 6,803,475.17 sales price for petitioners' stock was essentially the sum of (1) South Rock's reported earnings and profits at the time of sale of $ 446,358.06, and (2) the present value (at 6 percent) of petitioners' 90 percent interest in South Rock's ten year $ 1 million stream of income under the Management Agreement, less $ 500 thousand. Not coincidentally, the sales price was to be paid by a cashier's check at closing (which was not in fact done) equal to South Rock's earnings and profits and a nonrecourse note for the balance payable also over a ten-year period. We conclude that the sales price of petitioners' South Rock stock was grossly overvalued, indicative of a lack of arm's-length dealing between petitioners *572 and Mr. Stephenson and the absence of a true sale. Most significant to our conclusion is that the sales price was based upon South Rock receiving $ 1 million in fees over ten years, yet after two years the Management Agreement could be terminated by either party upon 30 days' notice. In the circumstances, we believe a reasonable fair-market value would be the value of South Rock's net assets (i.e., assets minus liabilities) as of the date of sale plus the present value of two years' expected management fee income. Petitioners' expert opined that as of July 1, 1979, South Rock had a fair-market value of between $ 5,519,059 and $ 6,570,746, with a midpoint value of $ 6,044,902. The midpoint value included a tangible net worth of $ 786,466 and a value from operations of $ 5,258,426. Petitioners' expert acknowledged the volatility of South Rock's future income, [4] yet his opinion as to South Rock's value from operations incorrectly assumed the presence of income from the Management Agreement well beyond two years. Accordingly, we find petitioners' expert's valuation of South Rock's stock to be substantially overstated. *573 Upon the advice of petitioners' tax counsel, the final sale documents did not include a provision proposed by Mr. Stephenson whereby payments under the note would be contingent upon South Rock receiving annual fees from Bercanus of $ 1 million. Nonetheless, an explanation for the excessive sales price of the stock may be that Messrs. Portermain and Stephenson had an understanding just the same. Such an understanding would, in effect, make the payment of the purchase price of South Rock contingent upon receipt of some amount of fee income from Bercanus. Further, from Mr. Stephenson's perspective, the promissory note was nonrecourse and at best petitioners could merely reclaim the stock. He funded all payments to petitioners by taking distributions from South Rock. Thus, Mr. Stephenson had nothing to lose, but even assuming South Rock had no other income other than fees from Bercanus, he stood to gain about $ 500 thousand -- the excess of distributions from South Rock derived from management fees from Bercanus over debt service on the acquisition. However, as noted in , the mere fact that a buyer purchases a business (on a nonrecourse *574 basis) expecting to use its income to pay off the purchase price does not destroy a sale for tax purposes, even if payment of the purchase price is contingent upon the receipt of income. The facts of this case, however, are distinguishable from Brown. Here, the source of the income to be used to fund the "purchase" was not from unrelated third-parties, but from Bercanus, a corporation controlled by Mr. Portermain. Petitioners argue that a valid business purpose existed for selling their South Rock stock, and that tax considerations were secondary. They argue that Mr. Portermain turned South Rock into a profitable company and then decided to terminate his investment and use the proceeds for other investments. We reject this argument because almost all the profits referred to were simply funneled from Bercanus through the Management Agreement. Further, assuming that South Rock had the profit potential petitioners suggest, we fail to see why they would be motivated thereby to sell their stock. An explanation offered by Mr. Portermain was that since he was the indirect owner of Bercanus, other competing insurance companies would not do business with South Rock while he was *575 an owner, while Mr. Stephenson would not have this problem if he owned South Rock. We reject Mr. Portermain's explanation because while he contends South Rock would have greater value without his presence, the inescapable truth is that South Rock had little value without him. Further, we do not believe that Mr. Stephenson had the true business purpose of expanding South Rock, nor do we think he could do so without Mr. Portermain. Rather, we find that Mr. Stephenson agreed to "purchase" the stock simply for the excess of distributions from South Rock derived from management fees from Bercanus over payments on the note to petitioners. Mr. Stephenson was a mere conduit in petitioners' failed scheme to transmute ordinary income into long-term capital gain. Addition To Tax Under Section 6653(a)
The final issue for decision is whether petitioners are liable for the 5 percent addition to tax under section 6653(a) on the underpayment attributable to both the installment sale gain and the constructive dividend income. The addition to tax under section 6653(a) applies if any part of any underpayment of tax is due to negligence or intentional disregard of rules and regulations (but *576 without intent to defraud). Under section 6653(a), "negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." , quoting . The Commissioner's determination of negligence is presumed to be correct and the taxpayer has the burden of proving the determination is erroneous. ; Rule 142(a). A taxpayer has a duty to file complete and accurate tax returns and generally cannot avoid this duty by placing responsibility with an agent. ; . However, a taxpayer may be insulated from liability for the negligence addition by a good faith reliance on professional advice. , affd. ; . To be insulated, however, *577 a taxpayer must have provided the agent with correct information and the error must be due to the agent's mistakes. ; . After deciding to dispose of their South Rock stock, petitioners sought the advice of both their accountants and attorneys as to how to structure the transaction in a manner that would result in long-term capital gain treatment. There is no indication that petitioners gave their advisors any incorrect information. Petitioners' attorneys studied the alternatives of a stock redemption and a sale to Mr. Stephenson. The attorneys advised that the risk was "not insignificant" that capital gain treatment would not result upon a sale to Mr. Stephenson, but that the risk was less than under the redemption alternative. We recognize that in some cases which involved substantial questions of law and fact, and where the complexity of the issues created confusion and uncertainty, we have held that the addition to tax under section 6653(a) would be inappropriate. , and cases cited therein. However, *578 we have also held that where we find that a transaction was in fact a sham and that the taxpayers knew or should have known that it was a sham, the imposition of the addition to tax under section 6653(a) is appropriate. , affd. . Here petitioners persisted with structuring the transaction as a sale to Mr. Stephenson, despite their attorneys' warnings of the "not insignificant" risk that the transaction would be characterized as a sham. Petitioner knowingly accepted this risk and must be held accountable. Accordingly, we hold that the imposition of the negligence addition is appropriate in the circumstances. In view of this decision, we need not address whether the underpayment attributable to the constructive dividend income was also due to negligence or intentional disregard of rules and regulations. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for 1980. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. For the period June 9, 1977 to December 31, 1978.↩
2. RULE 41. AMENDED AND SUPPLEMENTAL PLEADINGS * * * (b) Amendments to Conform to the Evidence: * * * (2) Other Evidence↩: If evidence is objected to at the trial on the ground that it is not within the issues raised by pleadings, the Court may receive the evidence and at any time allow the pleadings to be amended to conform to the proof, and shall do so freely when justice so requires and the objecting party fails to satisfy the Court that the admission of such evidence would prejudice him in maintaining his position on the merits.
3. The table of contents to respondent's opening brief summarizes his argument as follows: I. The purported sale of the South Rock, Ltd. stock was a sham transaction because it was conceived, structured, and carried out solely for purposes of tax avoidance. A. The parties to the purported sale of the South Rock, Ltd. stock treated it among themselves as an unreal device to avoid taxes, rather than a bona fide sale. B. In the purported sale of South Rock, Ltd. to Brian Stephenson, the rights and risks of ownership and loss did not shift to the purported buyer Brian Stephenson. C. In the purported sale of South Rock, Ltd., the buyer Brian Stephenson did not acquire an equity in the company South Rock, Ltd. D. In the purported sale of South Rock, Ltd., the sellers of South Rock, Ltd. never relinquished control of the property. E. There was an absence of arm's length bargaining between petitioners and the other individuals and entities involved in the purported sale of South Rock, Ltd. F. The purported sale of South Rock, Ltd. stock was a sham transaction because the sale price of $ 6,803,475.17 was grossly in excess of the fair market value of South Rock, Ltd. G. The purported sale of South Rock, Ltd. lacked any economic, commercial or legal purpose other than to achieve the desire tax effect of converting ordinary income into long-term capital gain.↩
4. Petitioners' expert's report stated the following factors bearing on South Rock's future: 1. South Rock's contractual engagement by Bercanus was for an uncertain period of time. 2. South Rock relied on a single outside source for its income and was limited in its ability to replace that source. 3. South Rock's management lacked control of the production sources. 4. Bercanus', and thus South Rock's, principal insurance product was one which had a history of highly volatile competition. Thus, on such a small volume concentrated in a tiny market segment, they were exposed to the competitive vicissitudes of the North American market. * * *↩